ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
FEB 15 2011
CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SAMUEL D. JACKSON, | § | |
|     PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:10-CV-150-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Samuel D. Jackson ("Jackson") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits under Title II and supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"). In July 2004,[1] Seibert applied for disability insurance and SSI benefits alleging that he had become disabled on May 25, 2000. (Transcript ("Tr.") 21, 74-77, 604A-604C.)

---

[1] In his October 31, 2008 decision, the ALJ stated that the claimant filed his applications on January 12, 2004. (Tr. 21.) However, both the "Application for Disability Insurance Benefits" and the "Application for

1

His applications were denied initially and on reconsideration. (Tr. 21, 46-50, 53-56.) The ALJ held a hearing on August 8, 2006 and issued a decision on October 26, 2006 that Jackson was not disabled. (Tr. 21, 605-15, 1033-50.) Subsequently, on December 13, 2007, the Appeals Council remanded the case to the ALJ for a new decision. (Tr. 21, 616-21.) The ALJ held a subsequent hearing on September 3, 2008, and issued a decision on October 31, 2008 that Jackson was not disabled. (Tr. 18-32, 1017-1032.) Jackson filed a written request for review, and the Appeals Council denied Jackson's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 7-10.)

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a

---

Supplemental Security Income" show that they were signed by Jackson on July 2, 2004 and received by the Social Security Administration on July 8, 2004. (Tr. 74-77, 604A-604C.)

five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a

responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III. ISSUES

Jackson presents the following issues:

1. Whether the ALJ applied the correct legal standard in weighing the treating source opinion;

2. Whether the ALJ properly evaluated Jackson's credibility; and

3. Whether the Appeals Council failed to consider "new and material" evidence.

## IV. ADMINISTRATIVE RECORD

### A. Relevant Treatment History[2]

#### 1. Robert Suter, D.O. ("Suter")

Suter treated Jackson through the John Peter Smith Health Center ("JPS Health Center") on at least seven occasions between November 16, 2006 and August 1, 2007 for a variety of symptoms including ongoing pain, headaches, anxiety, flea and tick bites, and sleeplessness. (Tr. 712-13, 720-27, 881-82, 885-86.) Suter diagnosed Jackson with, *inter alia*, chronic lower back pain and chronic anxiety, and prescribed him various medications. (*Id.*) During the

---

[2] The Court will only review the treatment history that is directly relevant to the issues before the Court.

treatment period, Suter noted that Jackson at times slept outside or at a friend's house (Tr. 720, 881), experienced "ongoing anxiety due to social situation" (Tr. 722), would not get his labs done (Tr. 726), and was non-compliant with his medication regime (Tr. 881). Suter also noted that Jackson "looks bad" and his social conditions were affecting his health. (Tr. 727, 886).

In a letter dated April 30, 2007, Suter opined that Jackson suffered from "chronic low back pain, hypertension, elevated cholesterol, abdominal pain, and poor living conditions." (Tr. 749.) Suter stated that Jackson suffered from chronic low back pain, required up to seven hydrocodone tablets per day, and was on a variety of medications for other medical conditions. (*Id.*) Suter further opined:

> At this point, Mr. Jackson does not have any written activity limitations that I can identify in the progress notes, however I do not think he is meaningfully active in any capacity at this time. Given his social situation, Mr. Jackson's prognosis for gainful employment seems poor and I would expect his disability to last more than 12 months.

In a Multiple Impairment Questionnaire ("Questionnaire"), also dated April 30, 2007, Suter indicated that he first began treating Jackson on November 16, 2006, had most recently examined Jackson on March 22, 2007, and that he treated Jackson on a monthly basis. (Tr. 750.) He diagnosed Jackson with the same impairments as listed in the letter above and stated that his diagnosis was supported by an MRI taken in February 2005 that showed "multilevel degenerative disc disease." (*Id.*) Suter opined that Jackson was able to sit, stand or walk for only two hours in an eight-hour workday; should not sit, stand or walk continuously in a work setting; and must get up and move around every fifteen to twenty minutes. (Tr. 752.) He further stated that Jackson could occasionally lift and carry up to ten pounds; had significant limitations

doing repetitive reaching, handling, fingering, or lifting; and his symptoms were likely to increase if he were placed in a competitive work environment. (Tr. 753-54.)

In addition, Suter opined that Jackson was minimally limited in his ability to grasp, turn, or twist objects; use his fingers or hands for fine manipulations; or use his arms for reaching (including overhead). (Tr. 753-54.) Suter also indicated that Jackson frequently experienced pain severe enough to interfere with his attention and concentration; his impairments were expected to last at least twelve months; he suffered from emotional factors that contributed to the severity of his symptoms and functional limitations; he was incapable of even "low stress" work stress; and that these symptoms and limitations first began in November 2006. (Tr. 950-51.) Suter further opined that Jackson's ability to work at a regular job on a sustained basis would be affected by the following limitations: (1) psychological limitations; (2) need to avoid heights; and (3) inability to push, pull, kneel, bend, or stoop. (Tr. 951.)

### 2. Annu Mehta, M.D. ("Mehta")

Mehta treated Jackson on at least eight occasions between November 6, 2007 and July 14, 2008 through the JPS Health Center. (Tr. 865-80, 933-34.) During Jackson's treatment period, Mehta noted, *inter alia*, that Jackson had a history of chronic pain and often refilled Jackson's medications. (*Id.*) Mehta indicated on February 5, 2008 that Jackson had a prescription medication dependence and instructed him that "per contract, hydrocodone will not be filled." (Tr. 872.)

In a Questionnaire dated July 18, 2008, Mehta indicated that she first began treating Jackson on November 16, 2006, had most recently treated him on July 14, 2008, and that she treated him every three months. (Tr. 924.) She diagnosed him with "chronic lower back pain—

6

poor living condition" and indicated his prognosis was "poor." (Tr. 924.) She indicated that her diagnosis was supported by an MRI dated June 16, 2006 that showed "multi level degenerative disk disease." (*Id.*) Mehta further opined that Jackson could sit, stand or walk only two hours in an eight-hour day, should not sit continuously in a work setting, and must get up and move around every fifteen to twenty minutes. (Tr. 926.) She further stated that Jackson could occasionally lift or carry up to ten pounds and was minimally limited in his ability to grasp, turn, or twist objects; use his fingers or hands for fine manipulations; and use his arms for reaching (including overhead). (Tr. 927-28.)

Mehta also indicated that Jackson frequently experienced pain severe enough to interfere with his attention and concentration; his impairments were expected to last at least twelve months; he suffered from emotional factors that contributed to the severity of his symptoms and functional limitations; he was incapable of even "low stress" work stress; and these symptoms and limitations first applied beginning in May 2000. (Tr. 929-30.) Mehta further opined that Jackson's ability to work at a regular job on a sustained basis would be affected by the following limitations: (1) psychological limitations; (2) need to avoid heights; and (3) inability to push, pull, kneel, bend, or stoop. (Tr. 951.)

### 3. John McCray, D.O. ("McCray")

McCray treated Jackson on multiple occasions from July 21, 2004 through April 24, 2006 at the JPS Health Center. (*See, e.g.*, Tr. 302-05, 308, 485-86, 531-32, 537-38, 545-46, 549-50, 552-55, 558, 641.) In a "Medical Release/Physician's Statement" dated March 15, 2006, McCray opined that Jackson was able to sit and stand a maximum of two hours in a workday and could not do any walking, climbing stairs or ladders, kneeling or squatting, bending or stooping,

7

pushing or pulling, keyboarding, or carrying. (Tr. 471.) McCray also stated that Jackson could not lift or carry objects weighing more than five pounds more than two hours a day and diagnosed Jackson with degenerative disc disease of the cervical and lumbar spines. (Tr. 471.)

## B. ALJ Decision

In his October 31, 2008 decision, the ALJ noted that Jackson met the disability insured status requirements through June 30, 2004. (Tr. 23.) He stated that Jackson had not engaged in any substantial gainful activity since May 25, 2000, his alleged onset date of disability. (*Id.*) The ALJ further found that Jackson had the severe impairments of back pain, neck pain, depression, obesity, and "history of substance addiction disorder." (Tr. 24.)

Next, the ALJ held that none of Jackson's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 24.) As to Jackson's RFC, the ALJ stated:

> The claimant retains the residual functional capacity, over a sustained period of time, to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday, further limited by no climbing ladders, ropes, or scaffolds; with no manipulative or visual/communicative limitations; and with the ability to understand, remember, and carry out detailed (but not complex) instructions; in jobs requiring no work around hazardous moving machinery or unprotected heights and only occasional interaction with co-workers or the public.
>
> . . . . Light work generally involves the lifting of no more than 20 pounds at a time with the frequent lifting of up to 10 pounds, and standing and walking, off and on, for a total of 6 hours out of an 8-hour workday.

(Tr. 24-25 (internal citations omitted).) In making this determination, the ALJ went through the medical evidence in the record, stating, *inter alia*:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with

8

the objective medical evidence and other evidence . . . . . The undersigned has also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and 416.927.

. . . .

My finding regarding the claimant's residual functional capacity is supported by the objective medical evidence and the claimant's medical treatment history. In July 2000, the claimant presented with neck pain caused by a reported job injury, but an MRI showed only mild degenerative disc disease, the condition did not warrant surgery, and the claimant was not interested in surgery. In December 2000, he was determined to be at maximum medical improvement.

In May 2003, the claimant underwent a physical and neurological examination by Dr. George Crisp, a board-certified neurological surgeon. Dr. Crisp's examination of the claimant was essentially normal, however, and Dr. Crisp noted that although the claimant reported being unable to work due to neck pain, the claimant's most recent MRI showed only a minimal annular bulge at C5-6, and Dr. Crisp found no objective evidence to account for the claimant's symptoms. I also note the evidence that the claimant was mowing yard only one month prior to Dr. Crisp's examination.

In March 2004, the claimant underwent a functional abilities evaluation showing that he was capable of light to medium exertion. In February 2005, an MRI of his lumbar spine showed degenerative disc disease at L3-4 and L4-5 with only mild impingement and no evidence of significant spinal stenosis.

In June 2005, the claimant underwent surgery secondary to a right tibial plateau fracture. By September 2005, he was looking for employment and reported having no side effects to his medication.

In November 2005, the claimant declined to have epidural injection therapy for his cervical pain. In January 2006, he continued to report no side effects to his medications, and his doctor stated that the claimant was "doing quite well" with his current treatment regimen. In April 2006, his doctor stated that the claimant was stable in his mood and pain control, and the claimant reported that he was working at that time.

(Tr. 25-26 (internal citations omitted).)

The ALJ further stated:

> I conclude that the claimant's symptoms have no substantial affect on his ability to work beyond the functional limitations and restrictions indicated by the medical evidence. Turning to the medical evidence, I find that his exertional and nonexertional capabilities are compromised, but not to the degree alleged (*i.e.*, an inability to work in any capacity). With regard to exertional limitations, in September 2004 (and again in January 2005), state agency medical consultants determined that the claimant was capable of light work, and I find that these opinions are well supported by the evidence as a whole and warrant substantial weight in this matter. I have also provided nonexertional restrictions consistent with the most liberal interpretation of the claimant's impairments and symptoms, including a wide range of postural, environmental, and mental limitations.
>
> In making this determination, I considered Dr. Robert Suter's April 2007 opinion that the claimant has a poor prognosis for gainful employment, but I note that Dr. Suter had seen the claimant on only four occasions, and his opinion was clearly based on the claimant's "social situation" which is not a factor in this determination. I also note Dr. Suter's statement regarding the claimant's noncompliance. For these reasons, I find that Dr. Suter's opinion warrants very limited probative value in this matter. I also considered Dr. Anna Mehta's July 2008 opinion that the claimant was limited to sedentary exertion and had further nonexertional limitations, but I conclude that Dr. Mehta is associated with Dr. Suter's facility, and I find that her opinion warrants the same probative value as that of Dr. Suter.
>
> I considered Dr. John McCray's March 2006 statement that the claimant's disability was not permanent and was expected to last more than six months. Dr. McCray further stated that the claimant was limited to lifting about 5 pounds and sitting or standing for 2 hours in an 8-hour workday due to his neck and back problems. This opinion contradicts a functional abilities evaluation in March 2004, however, which showed that he was capable of light to medium exertion, and I find no subsequent medical evidence of a worsening of his neck and back problems. In fact, the evidence shows that the claimant was working in April 2006, only one month after Dr. McCray's statement. In July 2006, three months after Dr. McCray's statement, treating physician Dr. Neil Atlin recommended only that the claimant avoid any heavy lifting and bending. For these reasons, I conclude that Dr. McCray's opinion warrants very limited probative value in this matter.

(Tr. 29-30 (internal citations omitted).)

The ALJ opined, based on his RFC assessment, that Jackson was not able to perform his past relevant work. (Tr. 30.) However, the ALJ found that there were a significant number of jobs in the national economy that Jackson could perform; thus, he was not disabled. (Tr. 31-32.)

## V. DISCUSSION

### A. <u>Opinions of Treating Physicians</u>

Jackson claims, in essence, that the ALJ erred in rejecting the opinions of Suter, Mehta, and McCray, several of Jackson's treating physicians, without applying the required factors in 20 C.F.R. § 404.1527(d) and without good cause. Pl.'s Br. at 22-25. Controlling weight is assigned to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). *See also* 20 C.F.R. §§ 404.1527(e), 416.927(e). Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See id.*; *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating

11

physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)." *Newton*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original). Under the statutory analysis of 20 C.F.R. § 404.1527(d), the ALJ must evaluate the following: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d); *see also* 20 C.F.R. § 416.927(d); Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).

Pursuant to *Newton*, however, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 404.1527(d) *only* if there is no other reliable medical evidence from another *treating or examining* physician that *controverts* the treating specialist. *See Newton v. Apfel*, 209 F.3d 448, 455-57 (5th Cir. 2000). An ALJ does *not* have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as in cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507-11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in *Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of

a non-specialty medical expert who had not examined the claimant.")

In this case, the ALJ determined that Jackson had the residual functional capacity ("RFC") to do the following:

> [O]ccasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday, further limited by no climbing ladders, ropes, or scaffolds; with no manipulative or visual/communicative limitations; and with the ability to understand, remember, and carry out detailed (but not complex) instructions; in jobs requiring no work around hazardous moving machinery or unprotected heights and only occasional interaction with co-workers or the public.

(Tr. 24.) Based on this RFC determination, the ALJ indicated that Jackson had the RFC to perform "light work."[3] (Tr. 25.) In making this determination, the ALJ reviewed the evidence in the record, including the opinions of Suter, Mehta, and McCray. (Tr. 24-30.) The ALJ, in essence, rejected their opinions as he found they were of "very limited probative value." (Tr. 30.) As to Suter's opinion in April 2007 that Jackson had a poor prognosis for gainful employment and was not, in essence, capable of performing the full range of light work,[4] the

---

[3] Light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §404.1567(b); see 20 C.F.R. § 416.967(b); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

[4] Specifically, Suter opined that Jackson would be able to sit, stand or walk for only two hours in an eight-hour workday; should not sit, stand or walk continuously in a work setting; and must get up and move around every fifteen to twenty minutes. (Tr. 752.) He further stated that Jackson could occasionally lift and carry up to ten pounds; had significant limitations doing repetitive reaching, handling, fingering, or lifting; and his symptoms were likely to increase if he were placed in a competitive work environment. (Tr. 753-54.)

13

ALJ noted the following: (1) Suter had seen the claimant on only four occasions;[5] (2) Suter's opinions were clearly based on the claimant's social situation, which was not a factor in this determination;[6] and (3) Suter had indicated Jackson had been "noncompliant." (Tr. 30.) As to Mehta's July 2008 opinion that the claimant was limited to sedentary exertion and had further nonexertional limitations, the ALJ concluded that Mehta was associated with Suter's facility and found, therefore, that her opinion warranted the same probative value as Suter's opinion. (*Id.*) As to McCray's March 2006 opinion in the Questionnaire that Jackson was limited to lifting about five pounds and sitting and standing for two hours, the ALJ stated that his opinion was refuted by the following: (1) a March 2004 functional abilities evaluation that showed Jackson was capable of light to medium exertion (Tr. 222; *see* Tr. 220-34); (2) evidence that showed Jackson was working in April 2006, one month after McCray's statement (Tr. 568); and (3) a recommendation in July 2006 by Neil Atlin, M.D. ("Atlin"), a treating physician, that Jackson "only" avoid any heaving lifting and bending.[7] (Tr. 564.)

---

[5] The Court notes that this statement is incorrect because the evidence in the record indicates that Suter treated Jackson on at least seven occasions. (*See, e.g.*, Tr. 712-13, 720-27, 881-82, 885-86.)

[6] Suter actually indicated in the April 2007 Questionnaire that his diagnosis was supported by an MRI taken in February 2005 that showed "multilevel degenerative disc disease." (Tr. 750; *see* Tr. 513.)

[7] In the July 2006 "[f]ollow-up note," Atlin actually stated the following:

> Mr. Jackson presents today for further care regarding his chronic neck pain complaints associated with cervical disk herniation. He feels more recently with activities his neck pain radiating into his arm and hands has progressed. I explained we will take a conservative route and continue on his medications, and ask him to avoid any heavy lifting and bending.

(Tr. 564.)

14

The ALJ relied on, *inter alia*, the following evidence in making his RFC determination: (1) results of a July 2000 MRI taken after Jackson reported neck pain caused by a job injury showing only mild degenerative disc disease that did not warrant surgery (*see* Tr. 161); (2) December 2000 treatment notes from Fernando Mallou, M.D., showing Jackson was at "maximum medical improvement" (*see* Tr. 169-70); (3) May 2003 physical and neurological exam performed by George Crisp, M.D., a board-certified neurological surgeon ("Crisp"), stating that Jackson's most recent MRI showed only a "minimal annular bulge at C5-6" and there was no objective evidence to account for Jackson's symptoms (*see* Tr. 197-200); (4) evidence that Jackson was mowing yards only one month prior to Crisp's exam (*see* Tr. 212-13); (5) a March 2004 functional abilities evaluation showing that Jackson was capable of light to medium exertion[8] (*see* Tr. 222): (6) a February 2005 MRI of Jackson's lumbar spine showing "degenerative disc disease at L3-4 and L4-5 with only mild impingement and no evidence of significant spinal stenosis" (*see* Tr. 513); (7) September 2005 treatment notes from Atlin indicating Jackson was looking for employment and reported having no side effects to his medication (*see* Tr. 572); (8) November 2005 treatment notes from Atlin reporting Jackson declined to have epidural injection therapy for his cervical pain (*see* Tr. 571); (9) January 2006 treatment notes from Atlin reporting that Jackson was having no side effects to his medications and was "doing quite well" with his current treatment regimen (*see* Tr. 570); (10) April 2006 treatment notes from Atlin showing Jackson was stable in his mood and pain control and was working (Tr. 568); (11) evidence that Jackson was mowing yards in April 2003, looking for

---

[8] This functional abilities evaluation does not appear to have been performed by a physician as it states that the "patient was examined and tested by staff at Midway Testing Center." (*See* Tr. 222.)

15

work in September 2005, employed in some capacity in April 2006, and cleans his house at times; (11) determinations by state agency medical consultants ("SAMCs") in September 2004 and January 2005 indicating that Jackson was capable of light work (*see* Tr. 341-54); and (12) Atlin's opinion in July 2006 that Jackson avoid any heavy lifting and bending (*see* Tr. 564). (Tr. 24-30.)

The first issue is whether the ALJ was required to consider the statutory factors listed in 20 C.F.R. § 404.1527(d) before rejecting the opinions of Suter, Mehta and McCray. As discussed above, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 404.1527(d) *only* if there is no other reliable medical evidence from another *treating or examining* physician that *controverts* the treating specialist. *See Newton v. Apfel*, 209 F.3d 448, 455-57 (5th Cir. 2000). In this case, the ALJ relied on the following *medical opinion* evidence to reject the opinions of Suter, Mehta, and McCray that Jackson was not capable of performing the full range of light work: (1) a March 2004 functional abilities evaluation; (2) the opinion of Atlin, a treating physician; (3) the opinion of Crisp, an examining physician; and (4) the opinions of the SAMCs in September 2004 and January 2005.

As to the March 2004 functional abilities evaluation, there is no evidence such evaluation was performed by a physician or other acceptable medical source;[9] thus, it cannot constitute

---

[9] Only "acceptable medical sources" can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *See* 20 C.F.R. §§ 404.1513, 416.913; *see also* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); SSR 06-03p, 2006 WL 2329939, at *2 (SSA August 9, 2006) (stating that "only 'acceptable medical sources' can give . . . medical opinions"). Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a).

controverting medical evidence from another treating or examining physician. As to the opinions of Atlin and Crisp, neither physician gave an actual opinion regarding Jackson's limitations on work-related functions. Crisp, when examining Jackson's cervical spine, noted that Jackson experienced some tenderness, soreness, and limitations in extension and rotation. (Tr. 198-99.) He ultimately opined that Jackson had chronic neck pain and would probably be best treated by a referral to a pain clinic. (Tr. 197.) Atlin, who treated Jackson on numerous occasions, opined on one occasion that Jackson should avoid heavy lifting and bending but never gave any opinion on Jackson's physical limitations in the work place or what activities he would be able to perform. Thus, the opinions of Atlin or Crisp are not controverting opinions to the opinions of Suter, Mehta, and McCray regarding Jackson's limitations on work-related activities. *See, e.g., Alldredge v. Astrue*, No. A-08-CA-482-AWA, 2009 WL 1938905, at *5 (W.D. Tex. July 6, 2009) (stating that a doctor's opinion that failed to include an opinion on the claimant's ability to perform work-related functions does not controvert a treating physician's opinion on the claimant's ability to perform such work-related functions). As to the opinions of the SAMCs in September 2004 and January 2005 that Jackson was capable of performing light work, there is no indication that the SAMCs actually examined Jackson. (*See* Tr. 341-47.) Instead, the evidence indicates that their opinions were based upon medical records that they reviewed, including a June 2004 physical examination of Jackson. (Tr. 342.) Thus, the SAMCs' opinions are not from a treating or examining physician.

Because there was no examining or treating physician's opinion that controverted the opinions of Suter, Mehta, and McCray regarding what range of work Jackson was capable of performing in the work place, the ALJ was required to specifically analyze the factors set forth in

20 C.F.R. § 404.1527(d) before rejecting their opinions on this issue. In this case, the evidence shows that the ALJ acknowledged that he had a duty to analyze opinion evidence in accordance with 20 C.F.R. § 404.1527(d) and 416.927. (Tr. 25.) In addition, as to factors one and two, the ALJ acknowledged, albeit incorrectly, that Suter had seen Jackson on "only four occasions" and that Suter and Mehta worked at the same facility. (Tr. 30.) Even assuming that these incorrect and vague statements somehow satisfy the ALJ's statutory duty pursuant to factors one and two, the ALJ, at the very least, wholly failed to discuss the examining or treatment relationship that McCray had with Jackson. In addition, as to factor four, the ALJ also failed to acknowledge the consistency in the **three** treating physician opinions of Suter, Mehta, and McCray regarding Jackson's inability to perform light work. Because the ALJ failed to comply with his statutory duty pursuant to 20 C.F.R. §§ 404.1527(d) and 416.927(d), the Court concludes that remand is required.

Because the Court is remanding the case so that the ALJ can comply with his statutory duty, the Court will not consider the remaining issues presented by Jackson. The ALJ should consider such issues on remand.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with these proposed findings and conclusions.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate

18

Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until **March 1, 2011** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED February 15, 2011.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/kn

19